Good morning, Your Honors. May it please the Court, Armin Skalmowski for Petitioner Herman Radjab. I'd like to reserve two minutes for rebuttal. In this case, as a threshold matter, this case is a pre-Real ID Act case. The immigration judge did not make an adverse credibility determination. The BIA presumed credibility. Therefore, everything in the testimony must be presumed to be true, what Mr. Herman Radjab testified to. There was no adverse credibility finding. Correct, Judge. Therefore, everything that he testified to is true and correct. The IG found that Petitioner had qualified for a convention against torture relief, however, denied asylum, withholding cancellation of removal. Government appealed this part of the decision and the cap was reversed. Torture was conversed in this matter. In this case, Your Honors, Judge Posner of the Seventh Circuit said that murder or assassination constitutes torture. In this case, in 1985, Petitioner's parents and his brother were killed by the military in Indonesia. That part is certain. They, however, missed him. He fled the scene, moved to different locations. In 1989-ish, he was approached by some military people that asked about him. He denied who he was and fled the scene and went to a different location. He apparently moved around different locations through the late 80s and left Indonesia in 1990. An uncle had helped him through the years and had told him that the military was looking for him and wanted to kill him. He lost contact with his uncle in 1996, but until that moment, that year, he was told that the military was looking for him. Now, as in the Homolari case, Petitioner would be killed if he returns to Indonesia. Therefore, we believe that substantial evidence compels the conclusion that Petitioner is eligible for Convention Against Torture Relief in this case. He has a daughter who's here. Yes. And he spends weekends with his daughter, pays $291 a month for his support, provides her health insurance, pays for her after-school chess class. Correct. She's currently 17 years old, U.S. citizen. Would be able to adjust his status through her in about four years. If that record shows that he would have been killed at the time he left, what impact should the number of years that have passed have in making a determination as to whether a return today would threaten him with torture or death? Well, there's nothing in the evidence that would suggest that he wouldn't be killed. It is true it's been many years. His father was a general of some kind? Actually, military personnel. That's what he testified to. He didn't mention the rank. However, he did say that he believed that he would be killed because they were Christians. But wasn't it somewhat true that he didn't have a real good sense as to the reason for the killing of his father, his mother, and his brother? He wasn't 100% sure. That is true. And I believe at that point there might have been some speculation on his part. I do agree with that. However, there is a constant theme that there has always been problems. He did testify that previously he had had problems as a Christian in Indonesia, in school, with classmates, with other people in society. And then later with the government killing his parents, he thought of no other reason than that as why they were looking for him. Plus, the uncle had apparently mentioned something to that effect to him also. And he seems to be someone that... I'm sorry, mentioned what? That it might have been because of his religion or something to that effect that the family was being chased after by the military. This is here, though, on a cat claim, isn't it? Correct, Judge. So the protected ground isn't particularly relevant. That is true. I mean, there's no need for... I mean, it's not a requirement that it's a protected ground to find for a cat. That is correct. Could you... I'm going to ask the government's attorney this question as well. But looking at the BIA decision, I'm a little confused as to what they're saying. Because at AR3, which is the first page of their decision, they say he failed to meet his burden of proof for protection under the cat. And it goes on to say, then, the record does not clearly identify who killed the respondent's parents and brother, and why they were killed more than two decades ago. In a cat claim, I'm not quite sure what they were driving at. He did testify, as I understand it, that they were military personnel. And I thought that the IJ indicated that they were government agents who did the killing. So I don't know whether the BIA is looking for names or units or what, but I couldn't quite understand what they were. Anybody else who has cell phones that are in an on position, would you please turn them out now or forever be banned from the courts of the Ninth Circuit? Well, that was my cell phone that my law clerk forgot to turn on. Ah, okay. So I'm sorry, Harry. I've been ready to leave all along. Congress gets to make that decision, I think. It wasn't Battle Hymn of the Republic, otherwise I would have known it was you. No, it was Hail to the Chief. Okay. In any event, what's your understanding of what they were driving at there? Well, that's my, and then we mentioned in our brief that there's no need for the respondent to identify the individual military officials that were trying to kill him. And I think, because the immigration judge clearly said that, you know, I agree that the military was trying to kill the respondent petitioner. And so, yeah, I think they were trying to say, I'm speculating, but they were trying to say that we want to have, you know, who was it, what rank, what, you know, tried to kill the petitioner. And I don't think that's necessary for a CAT claim. Well, let's turn then. Also, you've already talked about the statement that the harm the respondent suffered does not rise to the level of persecution. The site seems to be talking about him being bullied, but I don't see where they address the fact that his family was murdered, which seems, as Judge Posner and more recently even I have written opinion, Tapia Madrigal, which recognizes that even in this circuit, a death threat certainly is an act of torture. And so I have some question about how linked he was to this killing. But what I want to direct your attention to is they then apparently conclude, I'm unclear, but I'm reading what the evolution of their statement concludes with, and it says, the respondent has not established on this record that it is more likely than not he will be tortured by the Indonesian authorities or through their acquiescence. What was the evidence in the record that you would cite to that refutes or contradicts what the BIA said in that part of its opinion? It's after the Lim site. Right. I see if they're okay. Yeah. Well, once again, most of the testimony regarding the murders was from direct examination. The government attorney didn't even ask many questions about this, and the judge also did not ask much. But the petitioner did say that he believes that the military itself was still looking for him and that they would kill him. And I believe that on its face would qualify under the statute that the government... That was what his uncle would tell him what he'd call. That was what his uncle would tell him what he'd call his uncle. That was, for instance, but his uncle was with him for a couple years, and he kept on asking his uncle, can I come back, can I come back? Yeah, that's what I'm talking about. Right. And the uncle said, no, stay where you are, don't come back to your house or your location. And then he finally left, and he tried to call back a couple times when he was in America, and then they said, don't come back. And then after 1996, he lost contact with the uncle. That's where we end on our time. Anything else? I think I'm out of time. I think we're out of time. Good morning. May it please the Court, Amy Carmichael for the government. This record does not compel the conclusion that it is more likely than not that the Petitioner will be tortured by or with the acquiescence of the government upon return to Indonesia. The Petitioner's testimony lacks sufficient detail to demonstrate who killed his parents or that the perpetrators would seek to harm him nearly 30 years later. Are we talking about what happened in the past, or are you talking about his current risk? A little bit of both, Your Honor. Opposing counsel mentioned that the military killed his parents and brother and that it's certain. However, it's far from certain that that's what actually happened based on Petitioner's testimony. Well, in terms of the military, is there any record evidence that military officers were ever disciplined for killing his parents or brother? There is not because the Petitioner testified that he never asked whether there had been any sort of investigation. He simply didn't know whether the incident had been investigated. And, in fact, he wasn't able to offer very much evidence regarding the incident itself. Well, how do you make out the fact that somebody was looking for him two or three years later and asking about it? Why would they be doing that if the military had been disciplined for having hurt him before? Well, the trouble is that we don't know any reason why they were looking for him, either good or bad. They could have been looking for him because they'd resolved his parents' murders and they were coming to tell him why, like what had happened. We don't know because the only evidence that we have. How do you account for the uncle's statement, then, that he should not come back if presumptively the uncle would know if the government was trying to give him some recompense for the murder of his parents? We also don't know where the uncle's information was coming from because Well, the IJ didn't make an adverse credibility finding. No, but the trouble is that even though he's credible, it's credible that that's what he believed and that's what his uncle told him, but that doesn't make it good evidence that that's what happened. So what was he supposed to do, go to Indonesia and do a collateral investigation? So he's asked about a number of things. For example, he didn't provide death certificates for his family, which he said was because he never inquired. He did not know where his family was buried. He was asked how his uncle knew the information, and he said, quote, I don't know exactly because I didn't ask. When he was asked about how his uncle could have gotten the information, for example, through his job, all he testified was that his uncle traded tires. We don't really have any information about his uncle, how his uncle came upon this information, and he didn't actually know what had happened. He testified that he arrived at the scene after the incident had occurred and he saw men wearing camouflage, and a friend told him that there had been an explosion and that he should leave. What did the IJ conclude with respect to who committed the murder? The IJ concluded that it was the military, but the board reversed that finding, finding that it wasn't supported by the record. He didn't have any idea who had actually perpetrated the explosion. He said that he saw people wearing camouflage who were on the scene, but he didn't see the explosion itself, and he didn't know why the people who were wearing camouflage were there. He testified that he did not know why the event occurred. Although he speculated that it was because his parents were Christians because he couldn't come up with another reason, he didn't actually know, and he did testify that none of his family members were politically active and they hadn't previously had any problems. He doesn't have to show motivation, does he? No, he doesn't. However, if his parents were killed for some other reason, like a reason that doesn't apply to him, that would be relevant to the question of whether it's more likely than not that he's going to be tortured upon return. At the time the officer approached him several years afterwards, what's your theory on why the officer would have asked, say he was looking for him, and specifically ask if he was the child of the person who was killed? His father was a career soldier, and he testified that his father was a career soldier, and I don't think it's... Except you have the uncle's statement, who's also telling him, don't come back. If the military was looking to give him some pension or something, why would the uncle have told him not to come back? We don't know, because we don't know where the uncle got that information. And he last spoke to his uncle in 1991 or 1992. He testified that he next tried calling in 1995, but his uncle's phone had been disconnected. He hasn't... Well, we know that Christians are this favorite group in Indonesia, right? Yes. And this Court has not specifically held that disfavored group applies to CAT, although the Court has suggested, but not found, that because the disfavored group is an evidentiary rule, that it could apply to CAT cases. However, the petitioner hasn't demonstrated that being a Christian on this record increases his chances of being tortured. And the record doesn't compel the conclusion that Christians are being tortured by or with the government acquiescence on any sort of regular basis. His brother was also killed. Yes, he does plead that. When he was asked why he had not provided death certificates, he testified that he hadn't investigated  So why would, if it was just some intramilitary disagreement, why would they kill his brother? If his brother was on the scene. But the problem is that this is a lot of speculation. Why would they or why wouldn't they? We don't know because the evidence doesn't provide the information about that. Is there anything to distinguish him from his brother that would indicate a reason for killing the brother, but not a reason for killing him if he returned? That we know of? No. But, again, I think that the real problem with this record is that there's just too much that we don't know. We don't know why his parents and his brother were killed. We don't know precisely how they were killed, except that his friend told him that there had been an explosion at the house. We don't know who perpetrated the explosion. And I think, to address Judge Fisher's earlier concerns, I don't think that the board was driving at that he needs to identify a particular perpetrator by name and rank. I think it's that Petitioner's evidence couldn't actually say, even if it was the military who had actually perpetrated the actions, because the only thing that he had witnessed was some people in camouflage at the scene after it had already happened. Well, but that's not the, you're breaking it apart, and as Judge Gwinn has pointed out, there's a lot of circumstantial evidence if he's accepted, his credibility is accepted, that concurrent or in the same time frame, relevant time frame, they came looking for him and they didn't appear to be bearing gifts. But they also didn't threaten him. He testified that what happened was they asked, Are you Herman? He said no. The guy left his card and said, If you see Herman, have him call me and left. He didn't threaten him. He didn't say, We're after Herman. He felt threatened because of what his uncle had told him, but there wasn't an actual threat from the man who made the visit. But his uncle's testimony weighs in the equation. Can you address what I asked counsel for the Petitioner, where the board concludes, has not established on this record it's more likely than not that the body will be tortured by the Indonesian authorities or through their acquiescence. Is it your contention that what you've been now talking about is the basis for that conclusion? Well, I think that there's two parts. One is what happened in the past, and one is the current country conditions. Evidence to be considered for torture includes both past acts and also flagrant or mass violations of human rights and other relevant information regarding country conditions. And the last thing that he heard from that was specific to him was in 1991 or 92 when he last talked to his uncle. And the current country conditions of record don't demonstrate the sort of flagrant mass violations of human rights that would compel the conclusion of torture. Where is that in the record? There's, I'm sorry, I don't have specific citations, but the country, there's country condition, there's a number of articles in the Human Rights Reports. Well, you don't have that? I don't have the specific page numbers. Well, the board doesn't cite them. No, the board just looks at them. So how do we know that they were looking at them any more than you can cite them? Just the record, the evidence that's in the record, I mean, presumably that's what they're looking at. Presumably? Is that a legal doctrine or that's just your speculation? I'm sorry, Your Honor, the board is looking at the record. There are country conditions in the record. Well, we've got cases where they haven't looked at the record and we've remanded when they haven't or granted relief when they haven't. So why should we take it on faith that they looked at some documents that you aren't able to cite? Usually when we get the BIA opinions, if they have, they cite them. I think that the board's making the ultimate conclusion, the ultimate legal conclusion is based primarily on the evidence that he had testified about, and that's also the primary focus of the immigration judge's decision. I would just note that there is also country condition evidence. The immigration judge's decision really focuses primarily on what he testified had happened in 1985, and the board reversed the immigration judge's findings related to that. So I think on those grounds, the evidence of past torture isn't sufficiently strong in this case to compel the conclusion that he's more likely than not to be tortured upon return. All right. Thank you. Thank you. All right. This matters. We've used up our time. So the matter is submitted. We'll take up the next case. Thank you, counsel. We thank counsel for their arguments.
judges: Gwin, Pregerson, Fisher